## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WENDY M. BURKHOLDER,** | : | **Civil No. 1:23-CV-216** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **MARTIN O'MALLEY,**[1] | : | |
| **Commissioner of Social Security,** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

### I.   Introduction

This case asks us to undertake a metaphysical analysis of whether the quantum of evidence described as "kind of iffy" lies between a scintilla and a preponderance. The claimant, Wendy Burkholder, protectively filed an application for a period of disability and disability insurance benefits on February 21, 2019, alleging disability due to supraventricular tachycardia, and other impairments, beginning May 5, 2019. Two hearings were held before an Administrative Law Judge ("ALJ"), and the ALJ found that Burkholder was not disabled from the date of her disability onset

---

[1]   Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Martin O'Malley is substituted for Kilolo Kijakazi as the defendant in this suit.

application through the date of the ALJ's decision, November 4, 2021. At Step 3 of the sequential analysis which governs social security cases, the ALJ relied upon the opinion of an impartial medical examiner, who testified at the hearing that it was "kind of iffy" whether Burkholder met the requirements of the listing for her arrythmia since the listing requires evidence of recurrent episodes of syncope, but the device which monitors her arrythmia does not document these types of associated symptoms. The ALJ relied upon this, at best, equivocal testimony at this crucial step and concluded that Burkholder's arrythmia did not meet the requirements of the listing which would have resulted in a *per se* disability determination.

Burkholder now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence. Mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that the ALJ's decision to rely upon the uncertain testimony of the medical examiner at Step 3 was not supported by substantial evidence. Therefore, for the reasons set forth below, we will remand this case for further consideration by the Commissioner.

## II.    <u>Statement of Facts and of the Case</u>

The administrative record of Burkholder's disability application reveals the following essential facts: Burkholder applied for disability and disability insurance

benefits on February 21, 2019, alleging disability beginning May 5, 2019.[2] (Tr. 314). She was born on February 8, 1967, and was approximately 52 years old at the time of the alleged onset of his disability. (Tr. 317) She is a college graduate, and previously worked as a title clerk and a behavioral specialist. (Tr. 69). In her application for disability benefits, Burkholder alleged she was limited in her ability to work due to supraventricular tachycardia, depression, anxiety, acid reflux, angina, and obesity. (Tr. 385). At the disability hearing, Burkholder testified that her supraventricular tachycardia caused symptoms like racing heart, dizziness, nausea, and "mini-seizures" about once a month that cause her to shake and pass out. (Tr. 76-77).

Burkholder underwent an ICD placement in 2015, after being diagnosed with supraventricular tachycardia (SVT). (Tr. 490). She continued to work after the implantation of her ICD device but testified that she started having trouble due to her inability to lift or be on her feet for as long and slowly decreased her hours until she was working only about sixteen hours per week. (Tr. 80-81). She testified that her previous employer accommodated her need to lie down and elevate her feet. (Tr. 81-81). In her function report, she stated that her SVT caused her to be tired,

---

[2] This date was amended from January 23, 2015 to reflect the date Burkholder last engaged in substantial gainful activity.

nauseous, have chest pains and rapid heart rate and abnormal hearth rhythms. (Tr. 405).

During the relevant period, Burkholder was being treated by a cardiologist and her primary care physician. Since our opinion hinges primarily upon the medical opinion evidence and the ALJ's Step 3 analysis, we summarize only the medical evidence as it relates to Burkholder's symptoms related to her arrythmia. The records show that following her ICD implant, she continued to have episodes of increased heart rate and syncope in April and August of 2016, and treatment notes indicate that the syncope correlated with episodes of arrythmia recorded on her ICD. (Tr. 614-616). Although, at appointments during the relevant disability period, she frequently denied syncope, (Tr. 552, 597, 843), she did report dizziness and palpitations at least twice a week. (Tr. 580). There is also evidence that her defibrillator discharged due to atrial fibrillation at least once during the relevant period, in June 2019. (Tr. 569). Burkholder testified that when her device powered, she felt a "twinge and then a pound" and fell down. (Tr. 48).

A telephonic disability hearing was conducted on April 2, 2021, at which Burkholder testified about her symptoms, stating that her main symptoms were caused by her supraventricular tachycardia (SVT), which she stated caused angina six times a day, racing heart, dizziness, nausea, and "mini-seizures" which she

4

described as mild seizures that caused her to shake and fall to the floor. (Tr. 76-77). She testified that she experiences these mini-seizures about once a month. (Id.)

The hearing was continued in order to obtain testimony from an impartial medical expert and an impartial vocational expert. (Tr. 15). On October 26, 2021, a supplemental telephonic hearing was conducted by the same ALJ. (Id.; Tr. 34-64). At the October hearing, a medical examiner specializing in cardiology, Dr. LeBeau, testified after having reviewed her file. Dr. LeBeau testified that the medical documentation in the record showed many arrythmias but did not document the symptoms that accompanied the arrythmias. (Tr. 40). Before testifying, he asked Burkholder if she had ever lost consciousness due to her arrythmias, and she stated that she had, in April and August of 2021. (Id.) When asked whether she met the listing for arrythmia (4.05), Dr. LeBeau said "it's kind of iffy" because there was no medical documentation of any syncope, which the listing requires, but the ICD device does not record the symptoms associated with arrythmia, including syncope. (Tr. 41). He went on to state that "she has not ceased to have episodes from what she tells us, one in April and one in August, approximately." (Id.) After this exchange, the ALJ moved on to obtain Dr. LeBeau's opinion regarding her RFC, and Dr. LeBeau opined that she had the capacity to perform light work. (Tr. 41-48).

5

Following the hearing, the ALJ issued a decision denying Burkholder's application for benefits. (Tr. 12-28). In that decision, the ALJ first concluded that Burkholder met the insured requirements of the Act through December 31, 2024, and had not engaged in substantial gainful activity since May 5, 2019, the alleged onset date. (Tr. 17-18).  At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Burkholder had the following severe impairment: arrhythmias. (Tr. 18). The ALJ determined that Burkholder's impairments of broken arm, obesity, and gastroesophageal reflux disease (GERD), resulted in no more than minimal limitations of function and concluded they were, therefore, nonsevere impairments. (Id.)

At Step 3, the ALJ determined that Burkholder did not have an impairment or combination of impairments that met or medically equaled the severity of one of the disability listing impairments, considering the requirements of Section 4.05 for her arrhythmias. The ALJ explained that the evidence of record did not support the clinical criteria for the listing level severity. Specifically, the ALJ noted:

> The claimant's arrhythmias do not meet the requirements of Section 4.05 of the Listings, because she does not have recurrent arrhythmias, not related to reversible causes, such as electrolyte abnormalities or digitalis glycoside or antiarrhythmic drug toxicity, resulting in uncontrolled recurrent episodes of cardiac syncope or near syncope, despite prescribed treatment, and documented by resting or ambulatory (Holter) electrocardiography, or by other appropriate medically

6

acceptable testing, coincident with the occurrence of syncope or near syncope.

(Tr. 19-20).

Between Steps 3 and 4, the ALJ then fashioned a residual functional capacity ("RFC") for the plaintiff which considered Burkholder's impairments as reflected in the medical record, and found that:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can lift and/or carry 20 pounds occasionally and 10 pounds frequently; she can sit without limitations; she can stand or walk for 5 hours each per 8 hour workday; she can occasionally climb ramps and stairs; she can frequently balance; she can occasionally stoop, kneel, crouch, and crawl; she cannot climb ladders, ropes, or scaffolds; she is precluded from overhead reaching with the bilateral upper extremities; she is precluded from exposure to unprotected heights; she can tolerate occasional exposure to moving machinery parts; and she is precluded from driving.

(Tr. 20).

In fashioning the RFC, the ALJ relied upon the testimony of Dr. LeBeau, noting that Dr. LeBeau opined that Burkholder would meet Section 4.05 of the listings if there was documentation that she became unconscious or nearly unconscious, but that Dr. LeBeau noted there was nothing in the medical evidence of record to support episodes of unconsciousness or near unconsciousness, which would be required by the regulations. (Tr. 25). The ALJ found the opinion of Dr.

LeBeau to be most persuasive, noting that it was consistent with the rather benign clinical and laboratory signs and findings of record and the treatment history. In finding Dr. LeBeau's opinion persuasive, the ALJ noted that the recent treatment was conservative in nature and was essentially limited to the use of medications and the implanted ICD, and that clinical findings showed she was in no distress and her heart was regular with normal S1, S2 and no murmurs, rubs, or gallops. (Tr. 26-27).

Having arrived at this RFC assessment, the ALJ concluded that Burkholder was capable of performing past relevant work as a title clerk and school aid as generally performed. (Tr. 28). Based upon these findings, the ALJ determined that Burkholder did not meet the stringent standard for disability set by the Act and denied her claim. (Id.)

This appeal followed. (Doc. 1). On appeal, Burkholder argues that the ALJ committed errors at Step 3 in finding her impairment did not meet the requirements of the listing.[3] For the reasons set forth below, we will remand this case.

---

[3] Burkholder also argues the ALJ committed errors in the RFC assessment and in evaluating the opinions of her treating physicians. Since we remand on the Step 3 issue, we do not address these arguments.

III.   **Discussion**

A.   **Substantial Evidence Review – the Role of this Court**

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205,

at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); <u>Burton v. Schweiker</u>, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); <u>see also</u> <u>Wright v. Sullivan</u>, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); <u>Ficca</u>, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." <u>Zirnsak v. Colvin</u>, 777 F.3d 607, 611 (3d Cir. 2014) (citing <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." <u>Burnett v. Comm'r of Soc. Sec. Admin.</u>, 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

11

> In <u>Burnett</u>, we held that an ALJ must clearly set forth the reasons for
> his decision. 220 F.3d at 119. Conclusory statements . . . are
> insufficient. The ALJ must provide a "discussion of the evidence" and
> an "explanation of reasoning" for his conclusion sufficient to enable
> meaningful judicial review. <u>Id</u>. at 120; <u>see Jones v. Barnhart</u>, 364 F.3d
> 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ
> particular "magic" words: "<u>Burnett</u> does not require the ALJ to use
> particular language or adhere to a particular format in conducting his
> analysis." <u>Jones</u>, 364 F.3d at 505.

<u>Diaz v. Comm'r of Soc. Sec.</u>, 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the

ALJ's decision under a deferential standard of review, but we must also give that

decision careful scrutiny to ensure that the rationale for the ALJ's actions is

sufficiently articulated to permit meaningful judicial review.

### B.    <u>Initial Burdens of Proof, Persuasion, and Articulation for the ALJ</u>

To receive benefits under the Social Security Act by reason of disability, a

claimant must demonstrate an inability to "engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can

be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); <u>see also</u> 20

C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe

physical or mental impairment that makes it impossible to do his or her previous

work or any other substantial gainful activity that exists in the national economy.  42

U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe

impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a

14

physician is misguided." <u>Cummings v. Colvin</u>, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. <u>Biller</u>, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. <u>See Titterington v. Barnhart,</u> 174 F. App'x 6, 11 (3d Cir. 2006); <u>Cummings v. Colvin</u>, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if

it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory

explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Id.</u> at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F.3d 429, 433 (3d Cir. 1999).

## C.   <u>Legal Benchmarks Governing Step 3 of This Sequential Analysis</u>

This dichotomy between the Act's deferential standard of review and caselaw's requirement that ALJs sufficiently articulate their findings to permit meaningful judicial review is particularly acute at Step 3 of this disability evaluation process. At Step 3 of this sequential analysis, the ALJ is required to determine whether, singly or in combination, a claimant's ailments and impairments are so severe that they are *per se* disabling and entitle the claimant to benefits. As part of this step three disability evaluation process, the ALJ must determine whether a claimant's alleged impairment is equivalent to a number of listed impairments, commonly referred to as listings, that are acknowledged as so severe as to preclude substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(iii); 20 C.F.R. pt. 404, subpt. P, App. 1; <u>Burnett</u>, 220 F.3d 112, 119.

In making this determination, the ALJ is guided by several basic principles set forth by the social security regulations and case law. First, if a claimant's impairment meets or equals one of the listed impairments, the claimant is considered disabled *per se* and is awarded benefits. 20 C.F.R. § 416.920(d); Burnett, 220 F.3d at 119. However, to qualify for benefits by showing that an impairment, or combination of impairments, is equivalent to a listed impairment, a plaintiff bears the burden of presenting "medical findings equivalent in severity to *all* the criteria for the one most similar impairment." Sullivan v. Zebley, 493 U.S. 521, 531 (1990); 20 C.F.R. § 416.920(d). An impairment, no matter how severe, that meets or equals only some of the criteria for a listed impairment is not sufficient. Id.

The determination of whether a claimant meets or equals a listing is a medical one. To be found disabled under step three, a claimant must present medical evidence or a medical opinion that his or her impairment meets or equals a listing. An administrative law judge is not required to accept a physician's opinion when that opinion is not supported by the objective medical evidence in the record. Maddox v. Heckler, 619 F. Supp. 930, 935-936 (D.C. Okl. 1984); Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability Law and Procedure in Federal Courts, § 3:22 (2014), *available at* Westlaw SSFEDCT. However, it is the responsibility of the ALJ to identify the relevant listed impairments, because it is "the ALJ's duty to investigate

the facts and develop the arguments both for and against granting benefits." Burnett, 220 F.3d at 120 n.2.

On this score, however, it is also clearly established that the ALJ's treatment of this issue must go beyond a summary conclusion, since a bare conclusion "is beyond meaningful judicial review." Burnett, 220 F.3d at 119. Thus, case law "does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis. Rather, the function ... is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." Jones, 364 F.3d at 505. This goal is met when the ALJ's decision, "read as a whole," id., permits a meaningful review of the SLJ's Step 3 analysis. However, when "the ALJ's conclusory statement [at Step 3] is ... beyond meaningful judicial review," a remand is required to adequately articulate the reasons for rejecting the claim at this potentially outcome-determinative stage. Burnett, 220 F.3d at 119.

### D.    This Case Should Be Remanded for Further Consideration.

Here, we are faced with both a fatally ambiguous medical opinion regarding whether Burkholder's documented arrythmia meets the disability listing and a broadly conclusory statement by the ALJ that she did not meet the requirements of the listing. The ALJ held a second hearing to obtain the opinion of a medical expert, Dr. LeBeau. Before testifying, Dr. LeBeau, seemingly trying to clarify some

ambiguity in the record, stated that there were "endless electrocardiograms here with various rhythms and so forth" and asked Burkholder if she had ever actually lost consciousness during any of the events. (Tr. 38). Burkholder stated that she had lost consciousness, even after the implantation of the ICD and the initial period when her medications were being adjusted, in April and August of 2021. (Tr. 40). The doctor went on to state:

> ME: Okay. Oh, the problem is that there are many, many arrythmias recorded – many, many and the symptoms that go with them are not recorded. So it's kind of useless information in a lot of ways, but that's what we have to deal with and I'll go from there.
>
> …
>
> ALJ: So, the usual first question I ask at this point, Doctor, is whether there are any listings met or equaled?
>
> ME: Well, the listing we're talking about here is 4.05 and it's kind of iffy because she has not ceased to have episodes from what she tells us, one in April and one in August, approximately. Oh, if the pacer defibrillator were working, you know, a little better I suppose she'd have none. That's the whole thing, oh, that 4.05 talks about just frequent

loss of consciousness or near fainting as being the criteria that you

would have to meet. She doesn't meet any other cardiac criteria.

ALJ: Well, I take it that the records don't identify any loss of

consciousness or near loss of consciousness?

ME: That's exactly right. . . .

(Tr. 40-41).

Thus, at the outset, it appears Dr. LeBeau was not entirely sure whether

Burkholder met the listing based on the available evidence, stating that it was "kind

of iffy[4]." He went on to explain that her records did show at least one instance where

she went into ventricular fibrillation which triggered her ICD device, but her heart

went back to normal rhythm before it fired and she "probably had no symptoms,"

despite Burkholder's prior testimony that she had fallen down when her device fired.

(Tr. 48). He went on to explain, "but, again, they don't record symptoms with these

things. They just record for the electrocardiograms." (Id.) In fact, it does not appear

from Dr. LeBeau's testimony that he was entirely sure whether Burkholder had ever

---

[4] Cambridge Dictionary defines "iffy" as "not certain or decided." Cambridge
Advanced Learner's Dictionary & Thesaurus, Cambridge University Press, 2024.
This definition reveals precisely what is wrong with this Step 3 analysis. If the sole
testifying expert says that the claimant's status is not certain or decided, then any
Step 3 decision –either pro or con – simply is not possible.

experienced syncope or whether her pacemaker had ever fired, stating "to my knowledge the pacemaker has never gone – and it almost went off once, but never has gone off in her, that I know of. She'll correct me if that is correctable."[5] (Tr. 44). The conversation continues with Dr. LeBeau's opinion that Burkholder could perform light work. (Id.)

The ALJ relied heavily on Dr. LeBeau's opinion in the decision, finding his testimony to be "most persuasive." However, the ALJ did not explain or resolve the ambiguities in Dr. LeBeau's testimony regarding the Step 3 analysis, simply stating in a conclusory manner:

> The claimant's arrhythmias do not meet the requirements of Section 4.05 of the Listings, because she does not have recurrent arrhythmias, not related to reversible causes, such as electrolyte abnormalities or digitalis glycoside or antiarrhythmic drug toxicity, resulting in uncontrolled recurrent episodes of cardiac syncope or near syncope, despite prescribed treatment, and documented by resting or ambulatory (Holter) electrocardiography, or by other appropriate medically acceptable testing, coincident with the occurrence of syncope or near syncope.

(Tr. 19-20). But it is also unclear how these requisite episodes of syncope or near syncope could be documented beyond the plaintiff's own reports of these symptoms since the device which documents her "many, many arrythmias" does not record the

---

[5] Indeed, the medical records show her defibrillator discharged due to atrial fibrillation at least once during the relevant period, in June 2019. (Tr. 569).

symptoms that accompany them. Indeed, it appears that Dr. LeBeau attempted to fill in the gaps in these records by asking Burkholder herself whether she experienced syncope, to which she responded she did. And, although the commissioner argues that the plaintiff cannot rely upon her own testimony and treatment notes of her self-reports of syncope but is rather required to present medical testing of episodes of syncope, it appears that even Dr. LeBeau was searching for the means to obtain this type of evidence, given the fact that the device which provides medical documentation of her arrythmias does not document the associated symptoms.

Simply stated, more is needed here. Where, as here, at this crucially determinative step in the sequential analysis which could determine whether a claimant is *per se* disabled under the regulations the ALJ has relied upon a medical opinion to make that determination, the opinion must have sufficient clarity to meet that conclusion. Thus, despite the deferential standard of review which governs our analysis, we will remand this case for further consideration by the commissioner as to whether Burkholder's impairment of arrythmia meets or medically equals the severity of one of the listed impairments of the regulations. Yet, while we reach this result, we note that nothing in this Memorandum Opinion should be deemed as expressing a judgment on what the ultimate outcome of any reassessment of this

evidence should be. Rather, the task should remain the duty and province of the ALJ on remand.

Simply put, the ALJ Step 3 determination in this case rests upon expert testimony, which is too uncertain, or "iffy" to sustain that conclusion. Therefore, this case will be remanded for further consideration by the Commissioner.

## IV.   <u>**Conclusion**</u>

Accordingly, for the foregoing reasons, this case will be REMANDED for further consideration.

An appropriate order follows.

<u>*s/ Martin C. Carlson*</u>
Martin C. Carlson
United States Magistrate Judge

DATED: May 2, 2024

24